Next case of the morning, number 18-20155, Shipman v. Multiple Defendants, including Sheriff Sowell. Mr. Clevenger. Good morning, Your Honors. May it please the Court, I'm Ty Clevenger here on behalf of Mr. Shipman, and if I may, I'd like to begin by quickly going through what I'll call the low-hanging fruit, issues that I think clearly require reversal, and also issues, in most of these cases, that just flat were not dealt with by either the district court or by the defendants and appellees on appeal. And I pointed this out in the reply brief, and I'm going to essentially throw the gauntlet down and ask them how are they going to respond to this. The first is in paragraph 25 of the Third Amendment complaint, and of course, we are dealing with a 12B6 dismissal, and so it is the complaint that controls here, and explains how a detective tampered with a witness. We had this raid on the car auction. I sent letters to the sheriff saying none of these cars were stolen. My clients had permission from the title owners to sell these cars. And then this detective goes out, writes out in his own handwriting a statement for this witness, threatens the witness with arrest if he doesn't sign it, and the witness signs it. Now, the reasonable inference is this goes in front of the grand jury and leads to an indictment. The other reasonable inference is the detective didn't bother to volunteer to the grand jury. Oh, by the way, I coerced the statement by threatening the witness. Those are the reasonable inferences. This paragraph has been ignored, top to bottom, in this case, and I would argue that that alone is a due process violation. Once a detective gets called out for not having a case, he doesn't get to go out and coerce or threaten a witness to try to retroactively create probable cause. So that alone would require reversal, and I will tell you, I don't think they're going to respond to it today because they can't. There is the issue of the seizure of his business records. Even if best case scenario for them, you were to say, okay, they have the right under the warrant to seize documents related to this auction, to seize documents related to these cars. They seized everything the man owned, and not just that, they held it for 16 months. After I was sending letters to both sheriffs, to the district attorney, saying these records have nothing to do with the car auction. Some of these are titles to other cars that he owns that he needs to sell, and he couldn't. And they just arbitrarily refused for 16 months to release any of these other records. They ignored. Today, seeing the prosecutor. Well, the prosecutor, actually the sheriff. The sheriff, who of course is a final policymaker and a Fifth Circuit president, received letters saying these don't pertain to the auction. But he can't give them back if the prosecutor is holding them for the case. He vitiated that argument when he arbitrarily released one of the vehicles. That was an argument they tried to make at one point earlier in the trial court. This is up to the state court. But then the sheriff just said, well, this is so-and-so's car. I'm going to let him have that one. So they showed no, they were not obligated to go get further permission from either the prosecutor or the court. This was the sheriff's decision, and the sheriff was doing this. There is a 2014 arrest for transporting stolen vehicles where none of the vehicles were stolen. And again, that's what's so crazy about this. Because in this day and age, as you know, a cop can walk up, look at your windshield, and run your VIN number by computer and instantly tell whether the vehicle has been reported stolen. And the defendant's argument here is, well, at some point. That was 2013. No, one of them is 2014. There is a distinction. Within the statute of limitations? Yes, Your Honor. I didn't recall that in your briefing. Yes, it is. Actually, that's brought out in both the opening and the... Who did it? Some of the same officers from this task force. Well, one of the problems I have with your briefs is disentangling Montgomery County from Grimes County and which officer from which officer. So it would have helped if you could remember their names. I believe that was... I believe that was... Because we're going to have to decide it on an officer-by-officer basis. Well, Your Honor, I would respectfully disagree as far as we're arguing a civil rights conspiracy here. That there were a lot of people involved in a joint course of conduct. This was not just one random officer acting on his own over here, which I'll get to this in a moment. That's why I sided with the Lozman Supreme Court case. This was... As we stated in the opening of the complaint, they were trying to run this guy out of town. That was the whole purpose of this. Why is Montgomery County trying to run a guy out of Grimes County? They had a joint task force between the two counties, and this auto theft task force was jointly controlled by the two counties. And so, yes, the primary impetus for this, and this is also in the pleadings, you had town council members, you had the sheriff of Grimes County, you had the DA of Grimes County wanting to get this guy out of town, but Montgomery County chose to join in with that and to persist. The other aspect in which Montgomery County gets involved is early on, back in 2014, early 2014, my client complains to the chief of the task force and says, your guys are targeting me with bogus stops and bogus citations. And that's when things really double down. So that alone, I would argue, is the first mental retaliation issue. My client had the right to go to that task force commander and say, your guys are out of control. But the problem was from that point forward, the retaliation just got stronger and stronger and more expansive. I mentioned briefly, you know, the 56 cars were seized at this auction, and I tried to argue, well, you know, that was not our choice, the state judge made that. The sheriff showed that, no, he could release these if he chose. Mr. Cottinger, suppose I agreed with you that there was no probable cause for the original seizure. Does the grand jury indictment cut off the chain of causation between any malfeasance that may have been committed by the defendants before and your claims today? There are two answers to that, two aspects to the answer. One is it depends on the claim, because some of the claims, specifically selective prosecution and selective enforcement, don't require a disproval of probable cause. You can have a legitimate indictment and still selectively prosecute someone. And that is one of the issues I had listed here, they've just really not dealt with that. Okay, best case scenario for them, it was a legitimate grand jury indictment. That does not change the fact that you've got officers going out and threatening witnesses and tampering with evidence, and you won't even investigate them, and yet you're trying to run my guy through the ringer. So that is not affected by a grand jury indictment. But then I would argue, and the case law is also clear on this, that where information has been withheld from a grand jury, where false information has been given to a grand jury, or where the investigators were reckless in their investigation in terms of what they produced in the match. Okay, but specifically on the withheld, because I understand if they presented all of the evidence to the grand jury properly, the grand jury indicts, then you've got the intermediary situation. Your argument is if you lie, cheat, and steal, that doesn't apply. So other than, you mentioned the officer going and causing the witness to lie. Other than that, what other specific, not just you imagining, but specific points of evidence do you have that show that the intermediary doctrine doesn't apply? Adequacy of the investigation. If you're going to raid a car auction on the premise that they're dealing with cars that have tampered titles, and that was what their whole premise was. This was organized crime, and the underlying crime was they've been tampering with titles. A reasonable investigation is going to figure out first, has anybody tampered with the titles? I don't know of a due process claim for an unreasonable investigation. I know of due process claims for falsely stating, making statements to a magistrate, or for I don't know of one for just saying they're stupid. I agree, Your Honor. We're talking about two different issues here. One issue is a freestanding due process claim, and I agree with you. It's not a freestanding due process claim, but the intermediary doctrine is a little bit broader. Under the intermediary doctrine, if you've not conducted a thorough investigation, then you just haphazardly walk. That is what's your best case for that proposition. If I may go back to my brief, may I bring that up on report? No, you're making an argument. You can file a 28, you can file a letter after argument. It is in the opening brief that we address that issue. Then the other big issue that they just ever so briefly dealt with, and that is towards the end of the complaint where they tell Mr. Shipman's customers that they don't have to pay their bills. You know what? I mean, this is all, if you will stop saying what they're not addressing. The court is prepared, and I bet we can ask about that. So why don't you start by defending your various claims and causes of action, which the court dismissed? Yes, Your Honor. Okay. If I may briefly address the Lozman case, that's the Supreme Court case that I brought up over the weekend. If I can just read one paragraph, and then it says, and I quote, an official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long-term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. An official policy also can be difficult to dislodge. A citizen who suffers retaliation by an individual officer can also seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. For these reasons, when retaliation against protective speech is elevated to the level of official policy, there's a compelling need for adequate avenues of redress. And you're saying it's official because the sheriff? The sheriff, the final policy makers of both counties were involved in this. The district attorney was involved in this. Now, what about the timing, though? When we're talking about the retaliation, I thought we had the arrest, and then we have your comments that you think they're retaliating for. So how can the arrest be caused by comments that happened after that? No, not the arrest. The continuing prosecution. Okay. But the First Amendment issue prior to the arrest was my client had gone to the commander of the task force and said, your guys are running crazy down here doing this to me. So that was the first instance where someone... That was retaliated by the arrest, and then your remarks caused the rest, or caused them to retaliate some more. So you're just saying it just keeps feeding on itself. Exactly. To the point that, and this is also in a place, they weren't just retaliating against my client, they were retaliating against my co-counsel, who is his counsel in the state trial defense matter. So, I mean, this is a very broad, systematic... I understand that. I want to be sure before your time's up that I've asked you about, you brought up the Curtis case, and obviously we don't have to take judicial notice of an opinion, we just can read it. But that said, you now say that the Curtis panel should send their case to us. Did you move to consolidate either case when they were first filed? I didn't move to consolidate, I just noticed that they were related. Okay. So then how can it be that we're required to now intersect, or we're required to take over Curtis, or whatever, when you didn't seek to consolidate before you knew how Curtis was going to come out? I don't think you are required to, I just think it's discretionary where there's a potential conflict between the panels. I mean, the stuff you wrote was calling into question a lot of things that strike me as if you thought all that, why didn't you move to consolidate, so I was just trying to understand that. Frankly, it all came to your honor, I didn't understand that it was necessary to formally file a motion to consolidate. I thought when I noticed them as related cases, that the clerk's office took care of it from there, and I learned the hard way, that's not the way this works, so it was purely my mistake. Fair enough. Well, let me just predict that that's up to the other panel. Yes, Your Honor. Certainly. One of the other cases that I mentioned that I want to talk about briefly is in Butler v. Compton, that's the Tenth Circuit case, and I think this is where things get a little closer for us. There's another case that I didn't mention in the briefs that I think is also interesting, it's called Poventude, P-O-V-E-N-T-U-D, v. City of New York, that's 750F3D121, and in that case, there was a Brady violation in the first conviction of murder, and that was subsequently vacated at the state level because of the Brady violation, and this guy files a suit, and subsequently takes a plea, in the second case, to a lesser-included offense. In the Second Circuit, this is not an issue of, there's no conflict here, the, I'm sorry, the conflict is, you do not necessarily implicate the validity of the second conviction by challenging the first, and I only cite that in the Butler case to make the point that, if you're going to argue that this would invalidate or call into question the validity of a prior conviction, it has to be an absolute, a necessary inference, it's not just, well, these two cases are kind of related, and you took a plea here, and this is kind of related to that, because they happened on the same day, this has to be very, very specific, and what the defendants have done is they've tried to say, oh, well, this tampering with the titles, that's the same thing as the Class C unlicensed auction, and it's not, these are not the same event, they don't have the same evidence. Well, what about our decision in De Leon v. Corpus Christi? I don't think that is squarely on point, Your Honor, because, again, the issue here is where we had the plea, the plea was for purposes of resolving a totally unrelated case, it was not for purposes, in other words, he didn't take the plea to the Class C misdemeanor for that, he took the plea for having an unrelated, just like Butler, an unrelated case disposed of, and so the plea on the Class C was in no way in exchange for the records tampering, because there never was any records tampering. There's a reference to records tampering in paragraph 23 of the Third Amendment complaint that says the vehicle with the allegedly altered title had been sold months before the auction, yet the task force seized all 56 vehicles anyway. What vehicle are we referring to in paragraph 23? What is that vehicle? I forget the name of the purchaser, but it was truly a totally unrelated event, had nothing to do with this auction. Does it have anything to do with the vehicles that are mentioned in the probable cause affidavit? It does not. It's a totally different vehicle. Griffin? No. Right. Different. It's just, by the time they brought that vehicle into play, they had been caught seizing a bunch of vehicles without probable cause, and they tried to pull in another vehicle that was totally unrelated. It's apples and oranges. All right, sir. Mr. Plake? Plake. Yes, Judge. Good morning. May it please the Court. Wait. Sheriff Gage, is that Grimes County?         All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. Sheriff Gage, Detective Neely, and Detective Schleider in Montgomery County, Judge. Okay. Judge, I'd like to raise three issues before this Court. The first is whether the Heck v. Humphreys case bars Mr. Shipman's claims regarding his malicious prosecution. The second is whether the Heck v. Humphreys case bars his claims from the seizure of his vehicles. The third is whether he has pled an exception to the independent intermediary doctrine. On your first two questions, what is the best case you've got for the proposition that Heck applies to a class C misdemeanor, where the person was never incarcerated? I didn't find any distinction whether or not incarceration occurred, it's just whether or not there was conviction, and the probable cause that resulted in conviction is the same as throughout the case. Heck v. Humphrey is about 2254, and the federal habeas statute applies to state prisoners. State prisoners, right? So in order to talk about Heck v. Humphrey, we need to talk about AEDPA, 2254, and the power of federal courts to issue writs of habeas corpus to state prisoners. As I understand it, Mr. Shipman was never a prisoner. He was arrested, he was booked, he pled to a class C. I'm asking you, if there is a case anywhere in the United States that has ever said, we talk about Heck questions in the context of prisoners that were never imprisoned in state custody, and by state custody I don't mean simply arrested, I mean was actually put in jail to get a habeas corpus claim under 2254. I have not seen any case on that. I'd be happy to add a supplemental brief on that. De Leon case was deferred adjudication. I'm sorry, Judge? Are you familiar with De Leon v. City of Corpus Christi? That sounds familiar, but I don't recall the facts off the top of my head. Well I'm just looking at it, and it said, it was a Heck barred tort claim filed by a prisoner who, under federal law, pled guilty and received deferred adjudication for aggravated assault of a police officer. Which is why I'm curious about class C misdemeanors. I did not research that issue, I'm happy to follow up on that. Under state law, you can't be put in jail for class C misdemeanors, they're fine only? Right. So you can be arrested for some, not arrested for others? Nobody made this argument. This is the court's inquiry. I think I have to do a good job, and I think I have to do a supplemental brief on that particular issue. Mr. Shipman asked this court to adopt the case of Butler v. Compton out of circuit, and we, in my client's brief, cite the Hudson v. Hughes case. We believe that Hudson v. Hughes is more applicable than Butler v. Compton. In the Butler v. Compton case, the underlying criminal complaint, the underlying criminal charges were from unrelated arrests. So the court coming in and undermining the probable cause, and the one which he was convicted for, or one he was not convicted for, would not affect the other arrest. In the Hughes case, we have two arrests, or two charges stemming from the same arrest, and the court found that it would undermine the second charge even though it was not convicted because of the same probable cause. That's what we have in Mr. Shipman's case. In Mr. Shipman's case, the charges have been the same throughout the entire criminal case. I refer the court to the record starting at 101, which is the affidavit for search warrant for an unlicensed auction, 104, which is the actual search warrant where the officers are commanded to search and seize vehicles and documents as they pertain to an unlicensed auction. The declaration of Mr. Quinn, who was Mr. Shipman's attorney both at the criminal case and in the district trial court in this case, at record 325, where he says Mr. Quinn was convicted of selling a motor vehicle without a license. The third amendment complaint ... Well, now wait a minute, though. I mean, the auction never occurred, so when was he convicted of selling without the proper documentation? When was he convicted? Well, I mean, how are those the same charge? Because he and the other fellows were arrested before the auction took place, correct? Correct. But this was a plea deal, so the conviction was the result of a nulla contendere. The prosecutor offered to plea down all the charges that were filed originally to one class C misdemeanor, a fine. But the grand jury indictment was for this ... What was it? Organized crime. Organized crime. And did the grand jury indictment include selling ... How do you plead out to something that wasn't charged by the grand jury? Is that what happened? The prosecutor in this case, in the record, I want to say that 401, said this was a lesser included of the charges. Ah, okay. Let me check that site for you. It's a lesser included of the conspiracy to commit organized crime or whatever the ... Right. So if I look at record, it's page 400, which is the beginning of the criminal plea in this case. Mr. Daniels, who is the prosecutor in this case, tells the court specifically that both defendants, which would be Mr. Shipman and Mr. Williams, who does not have a pending suit, pled no contest to the lesser included class C offense of selling vehicles without a dealer's license. Okay. All right. Mr. Quinn's declaration, I spoke to him about a moment ago, was at R-325. The 30 minute complaint at R-336 indicates Mr. Shipman was convicted of selling a vehicle without a license, and again, the criminal trial, R-400. And then one more site was R-556, which was a statement by Mr. Quinn in the federal court in this case. So does your win here on appeal rise and fall on the Heck argument, or do you have any other arguments that you'd like us to consider? There are other arguments. Heck is, I think, the cognizant claim, it's kind of a threshold issue, is why we addressed it. If you distinguish from the Curtis case, we did not address it because Mr. Curtis was found guilty in a state regulatory proceeding, not in a criminal case. So for him, we went straight to the independent intermediary doctrine. So if you, for some reason, if Heck somehow does not apply to a Class C misdemeanor or something like that, then you would rely on Curtis? I would not rely on Curtis. I would rely on the same argument. The Curtis case, not Mr. Curtis, the Curtis case, because it found the independent intermediary doctrine to be controlling for most of the case. The only concern I had over relying on that is that the seizure was done pursuant to a warrant and not to the grand jury indictment. So Mr. Curtis. So you represent Mr. Sklyder, or Lieutenant Sklyder, right? Correct. So this sentence, Affiant, this is Mr. Sklyder, is the Affiant? In the warrant, in the affidavit? Yes. Affiant can state in Texas, in order for an individual to sell a vehicle, the title must be in the seller's name. Correct. That is not correct, right? I could not find a law in that one way or the other. But it's in the affidavit. It is in the affidavit. It's sworn under penalty of perjury to a magistrate to get a warrant. So, I'm sorry, you're saying you don't know if that's true? I really do not. I could not find anything in the statute. In reading the rest of the record, it looked like he was saying that these were third-party sales to third-party people. So I don't know if that's like a, he didn't speak correctly or he didn't add it all up correctly. But I couldn't find anything under the facts of this case specifically saying that that was true or false. Anyway, it's the magistrate who's supposed to know the law, right? And that was my thought on that was it was actually a conclusion of law rather than an actual fact. So you can't mislead a judge about the law? Well, I think that... Yeah, I think if he lied frankly about the law, that would certainly not be good for my client. But in this case, as to the affidavit... But let me ask that. If the misstatement is a misstatement of law, does that implicate the whole Frank line of cases? No. Yeah, I'm not sure on that one, Judge. I'm not sure I'd brief Frank. My analysis was that because Mr. Shipman only attacks two sentences out of the entire affidavit, which is a couple of pages long, specifically the one that Judge Oatman just raised and the other about whether or not the paperwork was a problem, and that the record between pages four, record 411 and 471 show exactly how messed up the paperwork entitled in these cards were. I'm not sure if you go through. I've got string sites for you here, but the entirety of that 411 through 470 shows how bad the titles in this case were. What do you mean how bad? They were in other third parties' names. There was also some restitution paid to other third parties that was required by the prosecutor. Well what do you mean? I mean, so when your fellow... I was very confused about this, and I'm sorry to have to ask about it. So they picked up the documents that were associated with the autos that were going to the auction, as well as some other autos, right? Right? They picked up, I think, everything that was there. Okay. And what were the documents? Why? I mean, if he does mostly repair shop, why does it matter what the title documents show? Was he functioning as an unlicensed auto dealer? Is that the contention, or what? That was the ultimate plea. If you look at the affidavit supporting the search warrant, it indicates a history of problems with Mr. Shipman. So although they did plead it down to that, the basis of the search warrant had more than just that in it. Yeah, he had had a bunch of run-ins for selling without proper documents, right? But there was also people who claimed that he had sold them vehicles that he didn't own, or he had sold vehicles that they owned, and came to take the keys, and things of that But when you drive by and you see cars on this, my understanding of reading this affidavit is that the officer drives by, he sees license plates to cars that do not belong to Mr. Shipman, and then uses that as an affidavit to get a warrant to go seize all of the cars. The fact that they don't belong to him is unremarkable, given what he was doing as his business. And the fact that this statement is, as you and I both know, it's not true now, but you are also telling me we're not sure it was true at the time, about the assertion that he made to the magistrate to get the warrant that started the whole case. Correct, but if you look at the affidavit as a whole, even if you invalidate one sentence, or say this sentence was incorrect, the affidavit has a lot more information in it than just those two sentences. Was he ever charged with anything with respect to Ms. Griffith? That's the one transaction you're referring to that is independent. There are two things referenced in this probable cause affidavit. There's driving by and seeing that the autos do not belong to Mr. Shipman, and then there's this anecdote about Ms. Griffith. But you're telling me that he was never charged with Ms. Griffith, this affidavit doesn't support charging him with Ms. Griffith. All we're trying to figure out is, could the task force go onto his property and seize 56 cars and all of the paper in the office on the basis of an assertion that, well, we know that they don't belong to him, because we've done a record search, and he can't sell them unless they belong to him. So we know that the second part is not true, and so I'm trying to figure out what would be the basis for the probable cause affidavit with what's left. And obviously, this is why my client would like Heck to borrow this, is because once he puts all of these facts in the affidavit in front of the magistrate and the magistrate signs off on it, he's then acting under the command of the magistrate. Understood. Okay. Any further? No, sir. Thank you. Ms. Rueda-Ponce? Rueda-Ponce. Yes, Your Honor. Good morning, Your Honors. May it please the Court. My name is Carmen Jo Rueda-Ponce. I represent Grimes County, Donald Silwell, David Cook, and Tuck McClain. We are here today asking the Court to affirm the District Court's dismissal of all of Mr. Leslie Shipman's claims. I believe the key facts that highlight the central issues in this case are relatively simple. There was a raid that was conducted by law enforcement officers pursuant to a search warrant. As a result of that raid, vehicles and records were seized. These vehicles and records serve the basis for Mr. Shipman's arrest, his indictment, his criminal prosecution, and ultimately his conviction. Do you think that this sentence is correct, the one that I was talking about with your co-counsel? Do you think it is true that Affiant can state – well, Affiant obviously stated. Do you think it is true that in Texas, in order for an individual to sell a vehicle, the title must be in the seller's name? Your Honor, I believe it has to be in his name or he has to have a dealer's license to sell vehicles that he does not actually own. Is it true that he could sell pursuant to a power of attorney? I believe if he did have a power of attorney to sell a vehicle that belonged to someone else that that would apply, but it's never made clear that he actually had power of attorney to sell any of the vehicles that were seized. But isn't that the whole purpose of having an affidavit to support a search warrant is to say we have probable cause that he doesn't have the power of attorney? Yes, Your Honor, and I believe in the affidavit – That's not in here. It doesn't say anything about powers of attorney in the affidavit. So given that – I agree with you that that's the purpose of what the affidavit is supposed to do. Yes, Your Honor. I'm just trying to figure out since it doesn't say that. The vehicles that he has, and I think the affidavit lays out that there's a multitude of paperwork problems, and I know paperwork problems may be a vague phrase, but they cannot clearly identify who owns these vehicles. Does he have the power of attorney? Does he have authority to be selling these vehicles at the auction? Would you wish out a dealer's license sell more than a certain number of vehicles even with a power of attorney? The power of attorney is my dad is in memory care, and my sister has a power of attorney, and it facilitates getting things done on his behalf. But she's not out there selling stuff on behalf of dozens of people as he is doing. Is a power of attorney a way around the dealer's license requirement? I don't believe so, Your Honor. I think you're correct in saying that there is a number threshold for which even if you have power of attorney or you own the vehicles, you're operating as a dealer, and you need to have a dealer's license in Texas. A probable cause affidavit does not need to plead every exception or every qualification of the applicable criminal law, does it? I would agree with Your Honor. It does not need to. Well, your client is a person, Mr. Cook. Is it correct or not correct that there are allegations here that specifically involve the sheriff of Montgomery County and the sheriff of Grimes County in this task force and in the operations that occurred with regard to these vehicles? The allegations in Mr. Shipman's third amendment complaint that refers specifically to Sheriff Solwell are vague in conclusion in that he held these vehicles while the criminal prosecution was pending, and that based on a simple letter from Mr. Shipman's attorney that, hey, you should release the vehicles, that somehow Sheriff Solwell went afoul of the law by not releasing the vehicles pursuant to this letter. What about the facts? So, okay, they seized the vehicles, let's say justifiably pursuant to a warrant. Now they've got them. Now they get a letter from a lawyer. I agree. Just saying my client says he's innocent probably isn't good enough because I'm probably not the first person to say that. But what about the facts? Can the sheriff just continue to hold cars knowing that, you know, Mrs. Smith owns the car and she had given consent to Shipman, or that Shipman, it turns out, does own the car, or Mrs. Smith wants her car back, or whatever? So all of that's within the discretion of the prosecutor as they're going through the case. It is not for the sheriff to decide whether or not to release these vehicles while there's a pending case. What about Mr. Clevenger's point that, okay, that sounded good until he gave up the one car, showing that he had the right to do that? Tell us about that. Your Honor, I'm not sure if the one car that was released, the sheriff had communications with the prosecutor at the time as to whether or not this was part of the vehicles which Mr. Shipman was trying to sell. I believe that they uncovered as they were going through the prosecution that this was a vehicle that belonged to someone who was there for a repair shop. And so rightfully that there is a mechanism for which they can release a vehicle that was not part of the underlying crime. And so I think to say, well, they should have held on to this one vehicle that they realized that they didn't have a legal reason to be holding on to seems a little odd in that respect. And the prosecutor would be immune if the prosecutor said, hold on to all the vehicles except this one that was being repaired while we look into this further. The sheriff would have his hands tied, and the prosecutor would be immune. That would be your position. Yes, Your Honor. If, in fact, Heck v. Humphrey doesn't apply to this set of facts, then what happens next? Your Honor, if we assume that Heck v. Humphrey does not apply to Mr. Shipman's federal claims or his state law claims, I think there's two points there that still would lead to the conclusion that his claims fail. First, the state law claims would fail under the Texas Court Claims Act as the district court judge found in his order. His federal claims would fail. I would tender to this court that the opinion in the Curtis case would be instructive and that there was probable cause by the grand jury indictment. And so for those two reasons, even if we get past of Heck, Mr. Claims still fails to state plausible claims for relief. Was there more evidence put before the grand jury than the officer's affidavit? Your Honor, I do not know the answer to that question because the grand jury proceedings are closed. How would we know how? We have the probable cause affidavit, so we can make a judgment about whether and to what extent information was withheld from the magistrate with respect to the seizure. How do you do that with the grand jury? You can't, Your Honor, and it's by design. The grand jury proceedings are supposed to be closed and sealed, so that way no one can go later. We have another case pending where the evidence suggests that maybe that was, yeah, before indictment, yeah, that the person was arrested, and then between that date and the date of indictment, more investigation occurred, for instance. Okay. I mean, put another way. I mean, it doesn't have to invade. What evidence was there? We don't know if it was presented to the grand jury. But if we know, let's say, there was witness A, affidavit B, and document C, then we know that evidence existed, and then we can say, well, that would have been available to the grand jury whether they looked at it or not. So what about that? What do we have in between the arrest and the indictment that would be additional evidence besides the officer's affidavit? The evidence that we know of that existed were the cars that were seized and the records that were seized relating to those cars and the sales of those cars. That is sure from beginning to the end. Those vehicles and those records were evidence of the fact that Mr. Shipman, as he pled to, was illegally selling those vehicles without a dealer's license. He was going to sell vehicles that had no proper title. He was going to sell vehicles that he did not have authority to sell. He did not have the license to be selling those vehicles. Well, that's because, okay, I see what you're saying. Yes, he was operating as a dealer. Well, now he claims, I mean, the assertion is that Mr. I keep getting a conflicts glider knew that a lot of these vehicles were on the premises solely for purposes of repair and not for the auction. Now, are there facts in the affidavit or anywhere in the record or in the pleadings that show how he knew that not all of those vehicles were tainted? That would show how Lieutenant Slider knew not all of those vehicles were tainted? Correct. Your Honor, I believe that the affidavit shows a history of citizens complaining to the task force officers that Mr. Shipman was selling vehicles that belonged to them or selling vehicles to him that they found out he later didn't have authority to be selling to him. So there was a history there of Mr. Shipman engaging in this type of conduct. That was in 2012 and 13, right? Yes, Your Honor. Right, okay. Leading up to? Leading up to this arrest and seizure in 2015, yes. And even, Your Honor, if we find issues with the affidavit, you find issues with the comments that Lieutenant Slider made, there is still the underlying conviction. He pled guilty to selling. And then what do you do? I mean, it's your client, isn't it, Cook, who is alleged to have strong-armed the auctioneer? I don't believe those allegations relate to Mr. Cook, Your Honor. I believe the comments you're referring to in the Third Amendment complain about he was just caught up in this. I believe that he alleges those were made by Lieutenant Slider. Slider? Okay, sorry. That's what I was getting confused about. Okay, no problem, Your Honor. I am out of time. Thank you. All right. Thank you. Mr. Clevenger. Thank you, Your Honors. I need to correct something up first. This has been argued today. I think for the first time on appeal, certainly it was not argued in the trial court, totally contradicted by the pleadings in flat, just didn't happen. That is, they're arguing that Mr. Shipman's issue was he didn't have a dealer's license, you know, and that he didn't have a dealer's license to sell these cars. That has never, ever been the issue in this case, completely outside the region. The issue was there was an auction. And Curtis didn't have the auction's license. Curtis did not have an auctioneer's license. Did he have a dealer's license? My client did not. Okay, then how could he? Now, I understand, again, the power of attorney when it's your dad or your husband or whatever that you need to have the power of attorney for, but how can somebody sort of set up a business where they get powers of attorney from dozens of people and not have a license? Jerry Williams is not a party to this case. My client's partner, Jerry Williams, had a license. He did have a dealer's license. Okay, so you're saying that it doesn't rest on the whole power of attorney issue. No, absolutely not. Okay. And that was never brought up in the trial court. You know, and, Your Honors, I have to point out I predicted that Paragraph 25, I threw down the gauntlet from the outset, said they're not going to touch it, and they can't. That's fatal to their clause. When you've got a detective going out and strong-arming false testimony out of a witness, there is no way. How was he able to strong-arm? What did he have on the – Well, according to the plaintiffs, Your Honors, he threatened the man with arrest if he didn't sign this. But you can't just – I mean, if I threaten you with arrest and you haven't done anything, I mean, arrest for what? I've never been in Grimes County, apparently. I mean, it does happen. This does happen. An unscrupulous officer can go out and say, well, I'll charge you with drug dealing or whatever. I mean, yeah, it may be an empty threat, but if you have somebody who's not articulate or well-versed in the law, the threat may nonetheless work. And that's the point. We have to go with what's in the police. And the evidence of this threat is what? According to the pleadings, we had a private investigator go out and interview this witness who told our private – Who said, yeah, I was coerced into signing that statement. And so if we sent this back for trial, would that be under 804 for unavailable – how would you get that evidence in? An unavailable witness. Okay, but it's not a sworn statement of an unavailable witness. Well, you know, there's the possibility, highly unlikely, that nonetheless Detective Slider would admit to what he did. Plus, I should tell you, we also – You're just saying at 12B6, I've alleged it, you've got to take it, Judge. Okay, I get that, but it's – Yes, sir. The idea that I sent some simple letter to the sheriff just saying my client sent it is absolutely not true. I went through and said these cars, my client had permission to sell these cars. And these letters – But what proof was there of that? So, I mean, it's not that much different to say my client's innocent than to say my client's innocent of car number 1, 2, 3, 4, and 5. What proof was there of his authority? If there's a car sitting there in my name at the dealership, what proof is there that they can sell that car for me? The burden is on them. If my client is saying I had permission from Mr. Masto to sell these cars, which is the letter that I sent, and then they send out Detective Slider, who strong-arms Mr. Masto and tries to get him to say, no, I never gave permission, they are deliberately trying to vitiate my argument. And the other point is this, Your Honor, with respect to the titles. That burden is on them. They have access to the VIN computer systems. I don't. They're the ones that can go out to these 56 cars and look and say, yeah, you know what, this is not a stolen car. I mean, it's been sitting out here for months and nobody's reported it. But, I mean, the sort of failure to investigate just doesn't strike me as a winner when you have qualified immunity and all that kind of stuff. The strong-arming thing, if that's true, I get you. But the failure to investigate, the, you know, sorry, state of affairs kind of argument, ah. Failure to investigate is not a claim, Your Honor. It only goes to whether the actions of the magistrate, it goes to the independent intermediary doctor. That's all this is relevant to. And there, under the case law of this court, it clearly is relevant. If there was not an adequate investigation, then the independent intermediary doctor. And did you find the case you wanted to tell us that on? I don't, but I will submit it by letter, Your Honor. Okay. And tell us about Heck v. Humphrey. You heard the questions that Judge Oldham asked. Do you have any comments on that? A few, briefly, Your Honor. One is we've got a lot of things that happen after the grand jury indictment. For example, at the end of the complaint, you know, where we've got them threatening people, tell them don't pay your car bills to my client. According to the pleadings, they did that for the express purpose of interfering with this litigation. So my client would go out of business. And it almost worked. And I'll tell you, Your Honor, the reason it didn't work is because I agreed to take this case on a contingency and went off hourly and we kept pushing it. They tried to stop this litigation. If that's not First Amendment retaliation, I don't know what is. And they've not addressed that and they cannot address that. I have no more time. Thank you, Your Honor. All right. Thank you. Court will stand in recess for 10 minutes.